Marion STEINBERG and Ralph Steinberg, Plaintiffs-
Appellants-Cross Respondents,

MILLER BREWING COMPANY, Involuntary-Plaintiff-Co-
Appellant-Cross Respondent,

v.

Dr. Thomas R. JENSEN, Wisconsin Health Care
Liability Insurance Plan, Physicians Insurance Com-
pany of Wisconsin and Wisconsin Patients
Compensation Fund, Defendants-Respondents-Cross
Appellants-Petitioners.

Supreme Court

*No. 92–2475. Oral argument April 4, 1995.—Decided June 30,
1995.*

(Also reported in 534 N.W.2d 361.)

441

443

For the defendants-respondents-cross appellants-petitioners there were briefs by *James G. Doyle, Paul J. Kelly* and *Schellinger & Doyle, S.C.,* Brookfield and oral argument by *Paul J. Kelly.*

For the plaintiffs-appellants-cross respondents there were briefs by *J. Ric Gass, Mark M. Leitner, Marilyn M. Carroll, Joseph S. Goode* and *Kravit, Gass*

& *Weber, S.C.,* Milwaukee; *Denis McNamara,* Elkhorn; *Mary L. Woehrer* and *Woehrer Law Offices,* Wauwatosa and oral argument by *J. Ric Gass.*

Amicus curiae brief was filed by *David M. Skog-lind,* counsel, Milwaukee, for the Wisconsin Academy of Trial Lawyers.

Amicus curiae brief was filed by *Stephen E. Meili,* counsel, Madison, for the Center for Public Representation, Inc.

Amicus curiae brief was filed by *Mark L. Adams,* counsel, and *Timothy A. Hartin,* counsel, all of Madison, for The State Medical Society of Wisconsin and The Wisconsin Hospital Association.

STEINMETZ, J. This case presents three issues for review. First, to what extent, if any, may defense counsel in either a medical malpractice or personal injury action communicate ex parte with the plaintiff's treating physicians? Subject to various restrictions set forth below, we hold that defense counsel may communicate ex parte with a plaintiff's treating physicians so long as the communication does not involve the disclosure of any confidential information. Second, to what extent, if any, may a defendant-physician personally communicate ex parte with the plaintiff's other treating physicians? We hold that outside a judicial proceeding, a defendant-physician may communicate ex parte with a plaintiff's treating physicians subject only to the physician's ethical duty to refrain from disclosing confidential information. Third and finally, if defense counsel elicits confidential information from one of the plaintiff's treating physicians during an ex parte communication, what is the appropriate sanc-

446

tion? We hold that the appropriate sanction is within the discretion of the trial court.

## I.

The plaintiff, Mrs. Marion Steinberg, is a 65-year-old woman who became permanently and severely brain damaged in August 1989, while under the care of the defendant, Dr. Thomas R. Jensen. Mrs. Steinberg and her husband subsequently filed a malpractice lawsuit against Dr. Jensen and his insurers, Wisconsin Health Care Liability Insurance Plan, Physicians Insurance Company of Wisconsin, and the Wisconsin Patients Compensation Fund.[1] The jury found that Dr. Jensen was negligent, but not causally so, and found that Mrs. Steinberg's past and future damages totaled $10.8 million. The Milwaukee county circuit court, the Honorable Patricia S. Curley, entered judgment accordingly. The court of appeals reversed the judgment and remanded for a new trial on the ground that the defendant and his attorney made impermissible ex parte contacts with the plaintiff's treating physicians and thereby potentially impaired the plaintiff's right to fair trial. *Steinberg v. Jensen,* 186 Wis. 2d 237, 276, 519 N.W.2d 753 (Ct. App. 1994). We now reverse the decision of the court of appeals.

Mrs. Steinberg first visited Dr. Jensen in April 1989 to receive treatment for shingles. During the course of his physical examination, Dr. Jensen discovered that Mrs. Steinberg had high blood pressure. Over the next four months, Dr. Jensen prescribed various antihypertensive medications in an effort to find one

---

[1] The Wisconsin Patients Compensation fund provides excess insurance coverage for all physicians in Wisconsin.

that was both effective and acceptable to Mrs. Steinberg.

On August 11, 1989, Dr. Jensen prescribed an antihypertensive medication called Maxzide. During the next week, Mrs. Steinberg suffered from fatigue, upset stomach, cramps, absence of bowel movements, and an inability to urinate. She made four telephone calls to Dr. Jensen informing him of these symptoms. On August 18, 1989, Dr. Jensen examined Mrs. Steinberg in his office, noticed that she had a tongue laceration, and concluded that she had likely suffered a seizure the previous night. He immediately admitted her to West Allis Memorial Hospital (WAMH).

Dr. Jensen called in nine consulting physicians to examine Mrs. Steinberg at WAMH. Three of these physicians were Drs. Feridoun Beroukhim, Walter Wong, and Matthew Hanna. Drs. Beroukhim and Wong are neurologists. Dr. Hanna is a nephrologist (kidney specialist).

Drs. Beroukhim and Wong examined Mrs. Steinberg on the same day that she was admitted into the hospital. They both diagnosed her as having a serious sodium deficiency called hyponatremia and implemented a procedure to correct the imbalance. Later that day, Mrs. Steinberg suffered a second seizure and became unresponsive.

On August 19, 1989, Dr. Hanna examined Mrs. Steinberg, who was still unresponsive, and consulted with Dr. Jensen concerning her condition. The next morning, Dr. Hanna again examined Mrs. Steinberg and found that she was alert and coherent and that her sodium level was completely corrected. One day later, however, Mrs. Steinberg lapsed into a coma. When she awoke, she was severely and permanently brain damaged.

On January 2, 1991, Mrs. Steinberg and her husband filed a medical malpractice lawsuit against Dr. Jensen and his insurers. The Steinbergs believe that Dr. Jensen negligently prescribed Maxzide, which caused Mrs. Steinberg's sodium level to drop, which in turn caused her to suffer a seizure. However, the crux of their negligence claim is that Dr. Jensen corrected Mrs. Steinberg's sodium deficiency too rapidly, resulting in a condition called central pontine myelinolysis (CPM).[2]

Thereafter, the Steinbergs deposed Dr. Jensen. During his deposition, Dr. Jensen testified that Drs. Beroukhim and Wong, the neurologists, were chiefly responsible for the correction of Mrs. Steinberg's sodium deficiency. After the deposition concluded,[3] Dr. Jensen called Drs. Beroukhim and Wong and asked them to meet with him. Dr. Jensen made this call on the advice of his counsel, Attorney Paul Kelly.

The following day, the three doctors met for approximately 35 minutes. Attorney Kelly was not pre-

---

[2] CPM is a neurological deterioration that is often associated with a rapid correction of a sodium deficiency. The medical theory is that as serum sodium is increased, water flows out of the brain. The brain becomes dehydrated and cells that produce myelin, which insulates brain cells, are destroyed. The patient's neurological condition initially improves, but after a few days demyelinating lesions develop in the central pons. Russell L. Cecil, Textbook of Medicine 2127 (James B. Wyngaarden, Lloyd H. Smith, Jr. & J. Claude Bennett eds., 19th ed. 1992); *see also* Richard Sterns, *Neurological Deterioration Following Treatment for Hyponatremia,* 13 Am. J. Kidney Diseases 434 (1989).

[3] Immediately after the deposition concluded, the parties entered into a stipulation, at the request of the Steinbergs' counsel, extending the time within which to add other potentially responsible parties. However, the Steinbergs did not add Drs. Beroukhim and Wong as defendants to the lawsuit.

sent. During the meeting, Dr. Jensen informed Drs. Beroukhim and Wong that he had recently been deposed in connection with a malpractice lawsuit against him, that CPM had been discussed during the deposition, and that because of his testimony they might be made parties to the lawsuit. Dr. Jensen also informed them that, in his opinion, the care given to Mrs. Steinberg was appropriate and, therefore, the lawsuit lacked merit. The doctors then discussed the appropriateness of the treatment given to Mrs. Steinberg, her reaction to the antihypertensive medication, the rate at which her sodium deficiency was corrected, and the relationship between that rate and her neurological impairment.

The Steinbergs learned of this meeting and its substance through formal discovery on July 30, 1991, when they deposed Drs. Beroukhim and Wong. The Steinbergs also learned that before Drs. Beroukhim and Wong attended their depositions, they reviewed the transcript of Dr. Jensen's deposition and Mrs. Steinberg's medical records from other hospitals.[4] Attorney Kelly had provided these materials to counsel for Drs. Beroukhim and Wong.

On August 7, 1991, the Steinbergs deposed Dr. Hanna. During his deposition, Dr. Hanna testified that he had not spoken to Dr. Jensen or his attorney. The Steinbergs asked Dr. Hanna questions requiring him to provide opinion testimony regarding the treatment of Mrs. Steinberg's condition. Subject to objections by his counsel, Dr. Hanna answered these questions and

---

[4] The issue of whether Drs. Beroukhim, Wong, and Hanna were given medical records that they were not entitled to review is not before this court. Neither the Steinbergs nor Dr. Jensen appealed from that part of the court of appeals' decision. *Steinberg,* 186 Wis. 2d at 259–63.

testified that Dr. Jensen's use of Maxzide was appropriate in Mrs. Steinberg's case.[5]

Following his deposition, Dr. Hanna encountered Dr. Jensen in a hallway at the hospital. During this two-minute encounter, Dr. Hanna volunteered to testify at trial on Dr. Jensen's behalf. According to Dr. Jensen, he and the other doctors involved in this lawsuit would regularly see each other in the ordinary course of their activity at the hospital.

On September 1, 1991, the Steinbergs amended their complaint to include a claim for punitive damages on the ground that Dr. Jensen "intentionally acted to deprive the plaintiffs of their right to a fair trial by conducting *ex parte* communications with other treating physicians in an attempt to influence witness testimony without plaintiff's consent and without notifying plaintiff's counsel." Dr. Jensen moved to dismiss the claim for punitive damages.

At the motion hearing, the Steinbergs argued that Dr. Jensen had violated the rule against ex parte contacts enunciated in *State ex rel. Klieger v. Alby,* 125 Wis. 2d 468, 373 N.W.2d 57 (Ct. App. 1985), and asserted that there was "a conspiracy among the treating physicians at large to gang up on the plaintiff." Dr.

---

[5] In their brief to this court, the Steinbergs assert that "Dr. Hanna's counsel prohibited any questions that required Dr. Hanna to give expert opinion testimony concerning Mrs. Steinberg's injuries and treatment thereof." After carefully reviewing Dr. Hanna's entire deposition, we disagree with this statement. Although counsel for Dr. Hanna objected to the form of numerous questions, his counsel prohibited him from answering only one question, and that prohibition was entirely appropriate. Answering the question would have required Dr. Hanna to reveal the substance of confidential discussions between Dr. Hanna and his attorney.

Jensen's counsel, Attorney Kelly, denied that a *Klieger* violation had occurred and assured the court that he had advised Dr. Jensen to "build a wall around himself with respect to other treating physicians." Attorney Kelly also assured the court that neither he nor Dr. Jensen had "had any conversations with anyone other than Dr. Beroukhim and Dr. Wong . . . ." The trial court granted Dr. Jensen's motion to dismiss the punitive damages claim, stating:

> While I'm not going to decide at the particular moment whether Dr. Jensen's conduct in contacting these doctors was appropriate or inappropriate, I can decide at this point that this is not the type of action in this courts's opinion that merits a punitive damage claim. Now, it may be that it merits some other type of sanction and some other kind of remedy under our discovery laws [but] since I haven't been asked to do that today, I'm not going to do it today.
>
> I will say it sounds as if . . . this was innocent as compared to some sort of conspiracy . . . .

The Steinbergs subsequently moved the trial court to impose sanctions based on the ex parte meeting between Drs. Jensen, Wong, and Beroukhim. Specifically, the Steinbergs sought an order preventing Drs. Wong and Beroukhim from testifying at trial as to whether Dr. Jensen met the standard of care in treating Mrs. Steinberg. The court denied the motion and concluded that no *Klieger* violation had occurred. The court reasoned that *Klieger* prohibits a defendant's attorney from conducting private pretrial interviews with the plaintiff's treating physicians; it does not pro-

hibit the treating physicians from engaging in "casual conversation" about the lawsuit.[6]

The trial began on April 14, 1992. The Steinbergs chose not to call Dr. Hanna as a witness. Instead, they read his deposition to the jury. Dr. Jensen subsequently called Dr. Hanna as an expert witness.[7] Dr. Hanna testified that Dr. Jensen exercised the requisite degree of care required of an average family physician and "delivered exemplary care in this case." Dr. Hanna also testified that shortly after the Steinbergs deposed him on August 19, 1992, he talked to Dr. Jensen for approximately two minutes and informed him that he would testify at trial on his behalf. Finally, Dr. Hanna's testimony revealed that three days before testifying, he

---

[6] In denying the motion for sanctions, the court stated:

> I think its just common sense to imagine that when a doctor gets sued for malpractice that he may in all likelihood mention to other doctors who may have been involved with this client that such is going on, maybe for moral support, maybe to alert them to the problem that they may be involved, whatever his motivation is. There is nothing wrong I believe in a doctor communicating with other people, be they physicians or other people, that he is being sued and perhaps alerting them that they can look for their summons and complaint as well.
>
> . . .
>
> So, first of all, I think that the [Klieger] case was directed at a defendant's attorney and I am satisfied in this case that at least on the basis of what I have seen, this is not a situation where Mr. Kelly or anyone on his behalf has sat down and talked to the current treating physicians as to what's gone on and gotten information from them that they wouldn't ordinarily be entitled to. I think this is a situation where the doctor who was being sued communicated to the other doctors that he was being sued, a violation of nothing, just casual conversation.

[7] Dr. Hanna was identified as an expert witness on December 2, 1991.

had a brief three-way telephone conversation with Dr. Jensen and Attorney Kelly.

Attorney Kelly subsequently explained to the court, outside the presence of the jury, that he made the call for the purpose of confirming scheduling. According to Attorney Kelly, Dr. Hanna had called Attorney Kelly's office and expressed annoyance because his testimony had been rescheduled on several occasions due to unanticipated delays in the trial. Attorney Kelly and Dr. Jensen were concerned that Dr. Hanna might not testify. Consequently, they personally called Dr. Hanna to confirm when he would testify. During the ensuing conversation, Dr. Hanna asked Attorney Kelly what he should review and what his testimony would be regarding. Attorney Kelly warned him that they could not discuss privileged information. He then told Dr. Hanna that he should review his deposition and that he would likely be testifying about the treatment he provided to Mrs. Steinberg, the treatment Dr. Jensen provided to her, and the antihypertensive medication called Maxzide. Attorney Kelly assured the court that he did not coach Dr. Hanna or attempt to engage in discovery.

After Attorney Kelly finished his direct examination of Dr. Hanna, the Steinbergs moved to strike Dr. Hanna's testimony on the ground that the telephone call violated *Klieger*. The trial court deferred ruling on the motion and instructed the Steinbergs' counsel to begin the cross-examination. A short time later, the trial court called the parties into chambers and informed them that it was ready to rule on whether a *Klieger* violation had occurred.

When the parties arrived in chambers, the Steinbergs withdrew their motion to strike and asked the court to instead impose sanctions against Attorney

Kelly. After allowing Attorney Kelly an opportunity to respond, the court ruled that the telephone conversation between Dr. Jensen, Attorney Kelly, and Dr. Hanna violated the rule stated in *Klieger*, and subsequently applied in *Zintek v. Perchik*, 163 Wis. 2d 439, 471 N.W.2d 522 (Ct. App. 1991). The court did not impose any formal sanctions at that time.[8] However, it did admonish Attorney Kelly, outside the presence of the jury, not to engage in any further ex parte communications. The court also granted the Steinbergs wide latitude in exploring the phone conversation on cross-examination. The only limit placed on this exploration was that the Steinbergs could not state or imply that Attorney Kelly had violated a rule of law.

The Steinbergs' counsel proceeded to vigorously cross-examine Dr. Hanna, asking him 28 questions relating to the telephone conversation between Dr. Jensen, Attorney Kelly, and Dr. Hanna. At one point the Steinbergs' counsel asked, "So you three good gentlemen got together and sort of created a little plan; is that correct?" Dr. Hanna responded, "No." After a series of similar questions, Attorney Kelly objected that counsel was abusing the witness, and the court temporarily stopped the cross-examination to admonish counsel against doing so.

---

[8] The trial court stated that, in its opinion, Attorney Kelly believed in good faith that the call to Dr. Hanna did not violate the rule against ex parte contacts set forth in *Klieger*. The court also stated:

> I'm going to hold off on [whether to sanction defense counsel] until the end of this trial . . . .. I'm a little perplexed as to what the appropriate sanction should be, if any, from this court. But I don't want to taint this jury with information which they really don't need to get at the issues in the case here.

At the close of the four-week trial, the jury found that Dr. Jensen was negligent in his care and treatment of Mrs. Steinberg. However, the jury also found that his negligence was not the cause of her injuries. Lastly, the jury found that Mrs. Steinberg's past and future damages totaled $10.8 million.

On motions after the verdict, the Steinbergs argued that because of the ex parte contacts involving Mrs. Steinberg's treating physicians, they were entitled to judgment notwithstanding the verdict or, in the alternative, to a new trial.[9] They also argued that sanctions should be imposed against Attorney Kelly. The trial court rejected these arguments, finding that the verdict was not contrary to the weight of the evidence and that no underhandedness had taken place. With respect to the telephone call involving Attorney Kelly and Dr. Hanna, the court found that Dr. Hanna's testimony was not "of such overwhelming magnitude that it changed the jury's verdict." Furthermore, the trial court noted that "plaintiff's counsel was permitted a very vigorous cross-examination of Dr. Hanna, his motives, who he talked to, [and] where he talked to them, . . . and [that] this was an example of bias which th[e] jury could [have] take[n] and run with it if [it] felt that Dr. Hanna had really done something underhanded . . .." Finally, the court concluded that the violation committed by Attorney Kelly was not egregious and that the only sanction warranted was the

[9] The Steinbergs also argued that they were entitled to a new trial on the basis that material issues were omitted from the special verdict and that the jury instructions were faulty. Because the court of appeals remanded for a new trial on the basis of the *Klieger* violation, it did not address these arguments. These arguments were not briefed to this court and therefore are not under consideration.

admonishment given in chambers against any further ex parte communications. The court then granted judgment on the verdict.

In a published decision, the court of appeals reversed the judgment and remanded for a new trial on the ground that Dr. Jensen and Attorney Kelly made impermissible ex parte contacts with Mrs. Steinberg's treating physicians and thereby "potentially skewered Mrs. Steinberg's right to a fair trial . . .." *Steinberg v. Jensen,* 186 Wis. 2d 237, 276, 519 N.W.2d 753 (Ct. App. 1994). The court of appeals held that Dr. Jensen, as Mrs. Steinberg's treating physician, breached the duty of confidentiality owed to her under sec. 905.04(2), Stats., when he informally met with Drs. Beroukhim and Wong. *Id.* at 263–64. The court also held that the telephone conversation between Dr. Jensen, Attorney Kelly, and Dr. Hanna plainly violated *Klieger,* and that the trial court should have imposed some type of limitation on the testimony of Dr. Hanna. *Id.* at 265.

Under the court of appeals' decision, once litigation has commenced regarding the appropriateness of a patient's past treatment, treating physicians absolutely may not communicate with each other regarding the plaintiff-patient. *Id.* at 265–66. If they do, the plaintiff need not show that any confidential information was actually disclosed—"whether confidential information was actually disclosed is irrelevant." *Id.* at 265.[10] With respect to the record in this case, the court of appeals stated:

---

[10] As persuasive authority for this point, the court of appeals cited *Yates v. El-Deiry,* 513 N.E.2d 519, 523 (Ill. App. Ct. 1987), and *Petrillo v. Syntex Labs., Inc.,* 499 N.E.2d 952 (Ill. App. Ct. 1986). In *Yates,* 513 N.E.2d at 523, the Illinois court of appeals stated: "Prejudice and improper conduct can be implied from the fact that the plaintiff's treating physician has . . .

> Granted, it might very well be the case that no inappropriate disclosures concerning the care of Mrs. Steinberg were revealed . . . .. The complete record of what transpired during the meeting [between Drs. Jensen, Beroukhim and Wong] will simply never be known. That is precisely the problem with these types of *ex parte* communications. They create an honor system which relinquishes the ability of the patient-claimant to control the physician-patient privilege.

*Id.* at 263. Thus, reasoned the court of appeals, any communication that has the potential to breach the physician-patient privilege is prohibited. *Id.* at 244.

## II.

[1]

This case requires a determination of whether the court of appeals has correctly interpreted the physician-patient privilege, sec. 905.04, Stats. The interpretation of a statute is a question of law, which this court reviews de novo. *Ball v. District No. 4 Area Board,* 117 Wis. 2d 529, 537, 345 N.W.2d 389 (1984).

Our analysis of the law begins with the physician-patient privilege and the public policy that underpins that privilege. In Wisconsin, the physician-patient privilege is purely statutory and is embodied in sec. 905.04, Stats.[11] The general rule of privilege is stated in sec. 905.04(2), which provides in relevant part:

---

engage[d] in *ex parte* conferences concerning the patient with the patient's legal adversary, and without the patient's consent."

[11] This court promulgated the Wisconsin Rules of Evidence pursuant to sec. 251.18, Stats. (1973), renumbered as sec. 751.12, Stats. (1993–94).

> A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made or information obtained or disseminated for purposes of diagnosis or treatment of the patient's physical, mental or emotional condition . . ..

The overriding purpose of the statute is to prevent the unnecessary disclosure of "confidential" information. Section 905.04(1)(b) provides:

> A communication or information is 'confidential' if [it is] not intended to be disclosed to 3rd persons other than those present to further the interest of the patient in the consultation, examination, or interview . . . or persons who are participating in the diagnosis and treatment under the direction of the physician . . ..

The public policy underpinning the privilege is to encourage patients to freely and candidly discuss medical concerns with their physicians by ensuring that those concerns will not unnecessarily be disclosed to a third person. To further this policy, the patient is deemed to own the privilege[12] and, accordingly, only the plaintiff may waive the privilege.

Section 905.04(4), Stats., lists the exceptions to the general rule of privilege. Defendants in personal injury actions and in malpractice actions commonly invoke the exception found in sec. 905.04(4)(c), which provides that "[t]here is no privilege . . . as to communications [that are] relevant to or within the scope of discovery . . . of the physical, mental, or emotional condition of a

---

[12] Section 905.04(2), Stats., provides in relevant part that *"[a] patient has a privilege* to refuse to disclose and to prevent any other person from disclosing confidential communications . . .

patient" in any proceeding in which the condition is "an element of the patient's claim or defense."

Based on the general rule of privilege stated in 905.04(2), Stats., and the exception stated in sec. 905.04(4)(c), the court of appeals has developed a body of law, consisting of five published decisions including *Steinberg,* 186 Wis. 2d 237, prohibiting defense counsel from communicating ex parte with a plaintiff's treating physicians. The seminal case is *Klieger,* 125 Wis. 2d 468. In *Klieger,* the defendant asked the plaintiff to provide a medical authorization permitting access to his treating physician's medical records. The plaintiff responded by providing a medical authorization permitting the examination of the medical records but specifically prohibiting discussion of the records with his treating physicians. The defendant sought relief, and the trial court ordered the plaintiff to provide defense counsel with a medical authorization that did not contain language restricting defense counsel's right to conduct ex parte interviews with the plaintiff's treating physicians. The plaintiff appealed from the order.

The court of appeals noted that because the plaintiff's medical condition was an element of his medical malpractice claim against the defendant, under the exception stated in sec. 905.04(4)(c), Stats., the physician-patient privilege did not protect "communications relevant to or within the scope of discovery . . .." *Id.* at 473 (quoting sec. 905.04(4)(c)). However, the court of appeals reasoned that the privilege still protected communications that were not "within the scope of discovery." The scope and permissible methods of discovery are set forth in sec. 804.01(1).[13] Because sec.

---

[13] Section 804.01(1), Stats. (1991–92), provides:

Parties may obtain discovery by one of more of the following methods: depositions upon oral examination or written questions;

804.01(1) does not list "private pretrial interviews" as a permissible means of discovery, the court concluded that the physician-patient privilege prohibits defense counsel from conducting such interviews, unless the plaintiff voluntarily waives the privilege by consenting to such interviews. *Id.* at 473–74.

Four years after *Klieger,* the court of appeals decided *Haack v. Temple,* 150 Wis. 2d 709, 442 N.W.2d 522 (Ct. App. 1989). In *Haack,* one of the plaintiff's treating physicians arrived for his deposition before the plaintiff's attorney arrived. The defendant's attorney instructed the physician on the mechanics of the deposition and told him that he would be asked "what he did, what he perceived, what he saw and what he knew." The plaintiff subsequently claimed that this communication violated *Klieger.* The court of appeals disagreed, stating:

> Among the private conversations disallowed by *Klieger* are those which relate to the substance of a medical case, i.e., hospital records, treatment records, and physician opinions and insights. However, *Klieger* cannot be read to disallow conversations like the one involved here, where counsel merely described for the doctor the mechanics of the deposition that was about to take place.

*Id.* at 718. Thus, the *Haack* court implicitly recognized that because the physician-patient privilege protects only confidential communications, a defendant's attorney may communicate ex parte with a plaintiff's

written interrogatories; production of documents or things or permission to enter upon land or other property, for inspection and other purposes; physical and mental examinations; and requests for admission. Unless the court orders otherwise under sub. (3), the frequency of use of these methods is not limited.

461

treating physicians so long as the communication does not involve any confidential information.

The next case to address the permissibility of ex parte contacts between defense counsel and a plaintiff's treating physician was *Zintek v. Perchik,* 163 Wis. 2d 439, 471 N.W.2d 522 (Ct. App. 1991). In *Zintek,* the defendant sought a court order compelling the plaintiff to sign a consent form authorizing defense counsel to conduct ex parte interviews with the plaintiff's treating physicians. *Id.* at 467. The trial court denied the request, concluding that such an order would directly contravene the holding in *Klieger.*

On appeal, the defendant made two arguments pertaining to *Klieger.* First, the defendant argued that *Klieger* "is premised on an erroneous interpretation of the physician/patient privilege." *Id.* at 468. The court of appeals summarily dismissed the argument, stating that *Klieger* is the law until either the court of appeals or the supreme court holds to the contrary. *Id.* at 468–69. Second, the defendant argued that *Klieger* was inapplicable because in *Klieger* the defendants sought privileged information from the plaintiff's treating physician. In *Zintek,* the defendant sought to speak with the plaintiff's treating physician regarding the care given to the plaintiff by the defendant and other physicians, which, according to the defendant, would not require the disclosure of any confidential information. *Id.* at 469. The court of appeals rejected this argument as well, stating:

> Under the [defendant's] proposed rule, a patient loses control of the privilege. While we are confident that the [defendant's] counsel would adhere to the letter and spirit of the authorizations, the [defendant's] proposed rule creates an honor system rather than one controlled by the patient and rules

of law. We choose not to adopt a rule which so trammels, undetected, a plaintiff's exercise of his or her privilege.

*Id.*

Prior to *Steinberg,* 186 Wis. 237, the last case to apply *Klieger* was *Wikrent v. Toys "R" Us, Inc.,* 179 Wis. 2d 297, 507 N.W.2d 130 (Ct. App. 1993). In *Wikrent,* the plaintiff claimed that she was injured when a toy refrigerator fell on her in the defendant's store. At the request of the plaintiff's family physician, Dr. David Hartman examined the plaintiff and gave her a report of his findings. She, in turn, gave a copy of the report to defense counsel. During her deposition, the plaintiff waived the physician-patient privilege and testified openly about the treatment that she received from her physicians, including Dr. Hartman. Defense counsel subsequently called Dr. Hartman and met with him to discuss his findings. Dr. Hartman later agreed to testify on behalf of the defendant.

Upon learning of these ex parte communications, the plaintiff filed a motion in limine to preclude Dr. Hartman from testifying at trial. The court granted the motion, and the jury subsequently found in favor of the plaintiff. The defendant appealed, arguing that *Klieger* did not apply because none of the conversations with Dr. Hartman involved confidences that were outside the scope of Dr. Hartman's report and, therefore, Dr. Hartman's testimony was improperly excluded.

The court of appeals affirmed the judgment, stating:

> [E]ven though Rule 905.11, Stats., provides that a privilege granted by chapter 905, Stats., is waived if the holder of the privilege 'voluntarily discloses or consents to the disclosure of any significant part' of

463

the protected material, the rule is not license for opposing counsel to have *ex parte* communications with those subject to the privilege. Simply put, although Wikrent's filing of this lawsuit and her subsequent revelation of aspects of her communications with Dr. Hartman and her other physicians may prevent her from enforcing the privilege, these actions do not vitiate *Klieger's* requirement that inquiry into these areas be made only in the course of formal discovery procedures.

*Wikrent,* 179 Wis. 2d at 305–06. Thus, under *Wikrent,* the rule enunciated in *Klieger* applies even if the plaintiff has completely waived the privilege that serves as the basis for the rule.

We disagree with the court of appeals' consistently expansive interpretation of the physician-patient privilege, and we now hold that defense counsel is not absolutely prohibited from communicating ex parte with a plaintiff's treating physicians. Statutory privileges are to be strictly and narrowly construed. *Franzen v. Children's Hospital,* 169 Wis. 2d 366, 386, 485 N.W.2d 603 (1992). The physician-patient privilege is a testimonial rule of evidence, not a substantive rule of law regulating the conduct of physicians. Therefore, its application is limited to judicial proceedings.[14]

---

[14] *See* 64 Wis. Op. Att'y Gen. 83, (1975) (citing *Wilkins v. Durand,* 47 Wis. 2d 527, 540, 177 N.W.2d 892 (1970); *Boyle v. Northwestern Mutual Relief Ass'n.,* 95 Wis. 312, 320, 70 N.W. 351 (1897)); *see also Rudnick v. Superior Court of Kern County,* 523 P.2d 643, 650 n.10 (1974) ("It is perhaps pertinent to remember the obvious, namely that the physician-patient privilege is a rule of evidence concerning the admissibility of evidence in court and is not a substantive rule regulating the conduct of physicians.").

Because its application is limited to judicial proceedings, the privilege does not prohibit defense counsel from engaging in ex parte communications with a plaintiff's treating physicians. Furthermore, under the privilege, a patient does not have the right to prevent his or her treating physicians from engaging in any conversation outside a judicial proceeding simply because confidential information could potentially be imparted.

This does not mean, however, that lawyers and physicians are free to openly discuss a plaintiff's medical treatment so long as the conversation occurs outside a judicial proceeding. Physicians owe an ethical duty of confidentiality to their patients that is broader than the express language of the statutory physician-patient privilege. *See Schuster v. Altenberg,* 144 Wis. 2d 223, 251, 424 N.W.2d 159 (1988). The ethical duty of confidentiality is broader than the privilege because the ethical duty applies irrespective of whether a lawsuit has been filed. By filing a lawsuit, a patient-plaintiff waives the privilege as to certain information,[15] but "does not automatically consent to the termination of the confidential relationship existing between [the patient] and . . . [the] physician." *Petrillo,* 449 N.E.2d 959.

The ethical duty owed by physicians is generally set forth in the Hippocratic Oath,[16] the American Medical Association's Principles of Medical Ethics, and the

[15] Despite the filing of a lawsuit, a plaintiff-patient retains the right to expect that his or her treating physicians will only release information that is relevant to the physical, mental, or emotional condition in issue. *See* sec. 905.04(4)(c), Stats.

[16] The Hippocratic Oath provides in part:

Current Opinions of the Judicial Council of the American Medical Association. *See Petrillo v. Syntex Laboratories, Inc.*, 499 N.E.2d 952, 957 (Ill. App. Ct. 1986). This ethical duty generally prohibits a patient's treating physicians from disclosing confidential information without the patient's consent. However, it does not prohibit a plaintiff's treating physicians from communicating ex parte with each other or with defense counsel regarding nonconfidential information.

We will not presume that either physicians or lawyers will engage in professional misconduct by knowingly discussing confidential information about a plaintiff-patient.[17] Such a presumption would demean both the medical and the legal profession. *See* Jacqueline M. Asher et al., *Ex parte Interviews With Plaintiff's Treating Physicians—The Offensive Use of the Physician-Patient Privilege,* 67 Univ. Det. L. Rev. 501, 528 (1990).

█

Nonetheless, we realize that physicians are not legal technicians and, therefore, absent some safeguards, a physician participating in an ex parte conversation with an attorney could inadvertently disclose confidential information about a plaintiff-patient. Based on the ethical obligation of confidentiality and

---

Whatever, in connection with my professional practice, or not in connection with it, I see or hear, in the life of men, which ought not be spoken abroad, I will not divulge, as reckoning all such should be kept secret.

*See Petrillo,* 499 N.E.2d at 957–58.

[17] A physician engages in "unprofessional conduct" by "[w]ilfully divulging a privileged communication or confidence entrusted by a patient or deficiencies in the character of patients observed in the course of professional attendance, unless lawfully required to do so." Wis. Adm. Code MED 10.02 (2)(n).

on the physician-patient privilege, the public has a right to expect that physicians will not reveal, inside or outside judicial proceedings, confidences that a patient discloses during the physician-patient relationship. *See Petrillo,* 499 N.E.2d at 957. In order to safeguard the reasonable expectations created by the physician-patient privilege and the ethical duty of confidentiality, we hold as a matter of public policy that when a defense attorney is involved in an ex parte conversation about the plaintiff with one or more of the plaintiff's treating physicians, the attorney should (1) inform the physician at the beginning of the conversation that he or she has the right to decline to speak with defense counsel, (2) warn that the conversation must be limited to matters that are not confidential, (3) instruct the physician not to disclose or discuss anything that he or she believes *might* possibly be confidential, and (4) take all steps reasonably practicable to ensure that the conversation does not stray into a discussion of confidential information.

In addition, as a matter of public policy, we hold that defense counsel may not engage in ex parte "discovery" with the plaintiff's treating physicians. Unlike a simple ex parte communication, ex parte discovery is akin to a private question and answer session wherein the lawyer asks questions designed to elicit previously unknown information from the physician. Such a practice is improper because it can easily lead to the inadvertent disclosure and consequent discovery of confidential information. The questioning attorney simply cannot reasonably anticipate the physician's response and, therefore, cannot protect against the disclosure of confidential information. Absent consent from the plaintiff-patient, an attorney who desires to

ask questions of a treating physician must do so either in the presence of opposing counsel or through a writing, an exact duplicate of which must be sent concurrently to opposing counsel.[18]

These restrictions do not prohibit all ex parte communications between defense counsel and a plaintiff-patient's treating physicians. Defense counsel may communicate ex parte with a plaintiff's treating physician so long as the communication does not present a risk of disclosing any confidential information, and so long as the physician is not represented by counsel as a party to the lawsuit.[19] For instance, defense counsel may discuss scheduling and procedural matters and may tell a physician that he or she might be joined as a party to the lawsuit.

The Steinbergs argue that allowing *any* ex parte communications would place on plaintiffs the practically insurmountable burden of uncovering and showing wrongdoing on the part of treating physicians or defense counsel. We disagree. Although plaintiffs have no way of knowing the exact substance of an ex parte communication between defense counsel and a treating physician, we believe that plaintiff's counsel can adequately reach the substance of any such conver-

---

[18] For example, if defense counsel is interested in employing a treating physician as an expert witness and wants to ask the physician about his or her views on the case, defense counsel must do so either in the presence of opposing counsel, or as a more practical alternative, through a writing, an exact copy of which must be concurrently sent to opposing counsel.

[19] Supreme Court Rule 20:4.2 provides:

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

sations through discovery methods and through cross-examination. Furthermore, by fully exploring the conversation on cross-examination, plaintiff's counsel may show that the treating physician is biased or has been unduly influenced. Such a showing would undoubtedly inure to the benefit of the plaintiff.

If the trial court finds that one or more of the plaintiff's treating physicians has disclosed confidential information to defense counsel, the trial court should exercise its discretion and impose sanctions that match the prejudice caused to the plaintiff by the disclosure of the confidential information. For example, if the trial court finds prior to trial that a treating physician has disclosed prejudicial confidential information to defense counsel, exclusion of the physician's testimony at trial would be an appropriate remedy. We stress that trial courts have broad discretion in selecting a sanction that matches the prejudice caused to the plaintiff.

Finally, we point out that our holding places restrictions on lawyers, not on physicians. In *Steinberg,* 186 Wis. 2d at 265–66, the court of appeals held that the physician-patient privilege prohibits the plaintiff's treating physicians from communicating with each other regarding the plaintiff's treatment or condition. We disagree with this interpretation of sec. 905.04, Stats., for two reasons.

First, as previously discussed, the privilege does not apply outside judicial proceedings. It is a testimonial rule of evidence, not a substantive rule of law. In the absence of a statutory mandate, this court lacks authority to regulate pretrial communications between individuals who are either parties or witnesses to the

469

lawsuit, unless the communications were held at the request of or in the presence of party counsel.

Second, assuming that the statutory definition of "confidential" applies, when a patient seeks medical care and communicates with a physician, the communication is *not* confidential as between "those present to further the interest of the plaintiff in the consultation, examination, or interview," or as between those "who are participating in the diagnosis and treatment under the direction of the physician." Section 905.04(1)(b). Because information relating to a patient's medical condition or treatment is not confidential as between the patient's treating physicians, neither the privilege nor the physicians' ethical duty of confidentiality prohibits the physicians from discussing such information with each other.[20] The initiation of a lawsuit does not transform nonconfidential information into confidential information.

We expressly overrule *Klieger,* 125 Wis. 468, and the cases applying it to the extent they are also inconsistent with our decision in this case.[21] The *Klieger* court's reliance on sec. 905.04, Stats., was misplaced because the privilege applies only to judicial proceed-

---

[20] Otherwise, physicians would not be able to consult with each other regarding a patient's condition. This would be a loss for patients because, as the court of appeals cogently recognized, such intra-disciplinary communications often result in patients receiving higher quality medical care. *See Steinberg,* 186 Wis. 2d at 265.

[21] Although *Haack,* 150 Wis. 2d 709, is based on *Klieger,* it nonetheless is consistent with our opinion insofar as it implicitly recognizes that a defendant's attorney may communicate ex parte with a plaintiff's treating physicians regarding nonconfidential information, such as the mechanics of a deposition.

ings. In addition, the *Klieger* court erred in interpreting the exception stated in sec. 905.04(4)(c) as meaning that a communication is "relevant to or within the scope of discovery" only when the method of eliciting the communication is a formal method of discovery, such as a deposition. *Klieger,* 125 Wis. 2d at 173–74. This interpretation of sec. 905.04(4)(c) is erroneous in three respects.

First, it equates "a communication relevant to or within the scope of discovery" with "a formal method of discovery." The two phrases refer to different things. The former phrase refers to the class of information that could be learned through the discovery process, even if it is actually learned through other means. The latter phrase refers to the manner in which the information is learned.

Second, it overlooks that the statute also excepts from the privilege communications that are "relevant to" the plaintiff's physical, mental, or emotional condition.[22] Certainly not all relevant communications will occur under the auspices of formal discovery, which leads to our third point.

The *Klieger* decision incorrectly assumes that Wisconsin's discovery rules define the exclusive forum in

---

[22] Despite filing a lawsuit, a plaintiff-patient retains the right to expect that his or her treating physician will only release information that is relevant to the issues in litigation. We note that although a party typically waives the privilege by filing a complaint for personal injuries or medical malpractice, a party can also waive the privilege in other contexts by raising an issue of physical, mental, or emotional health during the course of a case, such as when a criminal defendant enters a plea of not guilty by reason of mental disease or defect pursuant to sec. 971.15, Stats. *See State v. Taylor,* 142 Wis. 2d 36, 41, 417 N.W.2d 192 (Ct. App. 1987).

which litigants can communicate with potential witnesses or litigants. This is simply not true. Nothing in the rules states that litigants may not communicate informally with potential witnesses or litigants.

### III.

The Steinbergs' arguments are premised on the *Klieger* court's incorrect interpretation of the physician-patient privilege, sec. 905.04, Stats. The Steinbergs' arguments fail because we overrule *Klieger* and hold (1) that the physician-patient privilege is a testimonial rule of evidence that applies only in judicial settings, and (2) that defense counsel may engage in *limited* ex parte communications with a plaintiff's treating physicians so long as the communications do not involve the discussion of confidential information.

Two separate communications are at issue here. The first is the meeting between Drs. Jensen, Beroukhim, and Wong. This meeting did not take place during a judicial proceeding. Therefore, it is not governed by sec. 905.04, Stats. Furthermore, we note that the physicians' duty of confidentiality is not implicated here. The trial court implicitly found that no confidential information was discussed during this meeting. The court characterized the meeting as "a situation where the doctor who was being sued communicated to the other doctors that he was being sued, a violation of nothing, just casual conversation." Accordingly, we reverse that part of the court of appeals' decision holding that Dr. Jensen violated the physician-patient privilege, sec. 905.04, by entertaining this meeting.

The second communication at issue is the telephone conversation between Attorney Kelly, Dr.

Jensen, and Dr. Hanna. This communication also occurred outside a judicial proceeding and, therefore, is not governed by sec. 905.04, Stats. Under our holding in this case, a defense lawyer who engages in an ex parte conversation with the plaintiff's treating physician should (1) inform the physician at the beginning of the conversation that he or she has the right to decline to speak with defense counsel, (2) warn that the conversation must be limited to matters that are not confidential, (3) instruct the physician not to disclose or discuss anything that he or she believes *might* possibly be confidential, and (4) take all steps reasonably practicable to ensure that the conversation does not stray into a discussion of confidential information. Because these four recommended procedures, which are rooted in public policy, represent a change in the law, their application is prospective only.[23]

However, under the law existing at the time Attorney Kelly called Dr. Hanna, defense lawyers were prohibited from engaging in ex parte discovery with a plaintiff's treating physicians. Thus, we will examine whether Attorney Kelly engaged in ex parte discovery with Dr. Hanna. We will also examine whether Attorney Kelly elicited any confidential information and, if so, whether that information prejudiced the Steinbergs.

Attorney Kelly informed the court that he made this call to schedule Dr. Hanna's trial testimony and confirm that he would still appear, since his testimony had already been rescheduled numerous times. During the ensuing conversation, Dr. Hanna asked what he should review and about what he would be testifying. After warning that the conversation must be limited,

---

[23] Generally, a decision is given prospective application only when it changes existing law.

Attorney Kelly told Dr. Hanna to review his deposition and that he would be testifying about the treatment he provided to Mrs. Steinberg, the treatment that Dr. Jensen provided to Mrs. Steinberg, and the use of Maxzide.

This discussion focused on scheduling and procedural matters and did not present a risk of discovering any confidential information. We note that Attorney Kelly assured the court that he was not attempting to engage in ex parte discovery. The court found that this assurance was credible and that Attorney Kelly had acted in good faith. The trial court thus concluded that Attorney Kelly had not engaged in ex parte discovery. We agree with this conclusion.

■

The trial court gave the Steinbergs wide latitude in exploring the telephone conversation on cross-examination. Despite what the trial court subsequently characterized as a "vigorous cross-examination," the Steinbergs did not elicit *any* testimony indicating that the conversation involved the discussion of any confidential information. Because there is absolutely no evidence that any confidential information was imparted during this brief telephone conversation,[24] we hold that Attorney Kelly did not contravene the public policy that underpins the physician-patient privilege and the physician's ethical duty of confidentiality. Accordingly, we reverse that part of the court of appeals' decision holding that the telephone conversation violated the physician-patient privilege, sec. 905.04, Stats.

---

[24] We note that Attorney Kelly called Dr. Hanna during trial to schedule his testimony. Dr. Hanna had already been deposed. Thus, it is unlikely that Attorney Kelly was attempting to engaging in further discovery at this stage of the proceedings.

*By the Court*—The decision of the court of appeals is reversed and the cause is remanded to the court of appeals to consider whether the trial court erroneously instructed the jury on the issue of causation.

SHIRLEY S. ABRAHAMSON, J. *(concurring)*. I write separately because I agree with the basic rule established in *Klieger v. Alby,* 125 Wis. 2d, 468, 373 N.W.2d 57 (Ct. App. 1985), and its successor cases, although I do not agree with all of *Klieger's* rationale or language.[1] The majority errs in overruling *Klieger*. Finally, I do not agree with the approach of, or result reached by, the court of appeals in the case at bar, *Steinberg v. Jensen,* 186 Wis. 2d 237, 519 N.W.2d 753 (Ct. App. 1994).

---

[1] For a commentator's view of the law of Wisconsin on ex parte contacts with a treating physician, see Terry E. Nilles, *Ex Parte Contacts with Expert Witnesses,* Wis. Law., Dec. 1994, at 18.

For discussions of the issue of ex parte communications with a plaintiff's treating physician and the different state rules, see, e.g., John Jennings, *The Physician-Patient Relationship: The Permissibility of Ex Parte Communications Between Plaintiff's Treating Physicians and Defense Counsel,* 59 Mo. L. Rev. 441 (1994); Elizabeth Eggleston Drigotas, *Restricting Ex Parte Interviews with Nonparty Treating Physicians,* 69. N.C. L. Rev. 1381 (1991); Charles F. Redden and William B. Bower, *Qualifications to the Bar of Ex Parte Contacts with Physicians,* 79 Ill. B.J. 442 (1991); David L. Woodard, *Shielding the Plaintiff and Physician: The Prohibition of Ex Parte Contacts with a Plaintiff's Treating Physician,* 13 Campbell L. Rev. 233 (1991); Philip H. Corboy, *Ex Parte Contacts Between Plaintiff's Physician and Defense Attorneys: Protecting the Patient-Litigant's Right to a Fair Trial,* 21 Loy. U. Chi. L.J. 1001 (1990).

## I.

I read the *Klieger* rule as prohibiting ex parte discussions of a substantive nature between a defense attorney and a patient's treating physician after the patient has initiated a lawsuit. *Klieger,* 125 Wis. 2d at 474. *Klieger* does not prohibit a lawyer from communicating with a treating physician about insubstantial matters such as scheduling or procedural matters. *See Haack v. Temple,* 150 Wis. 2d 688, 442 N.W.2d 522 (1989). The majority opinion, however, overrules *Klieger* without adequately setting forth the *Klieger* rule or indicating the flaws of that rule. Majority op. at 471.

The *Klieger* rule, as I understand it, serves to balance a patient's privacy interest in preserving confidential communications with a physician, against a defendant's interest in presenting an effective defense, and against the public's interest in having the full disclosure needed to obtain a fair resolution of the dispute. *Klieger* recognizes that substantive information necessary for a defense can be obtained through the established channels of discovery. *Klieger,* 125 Wis. 2d at 474. The *Klieger* rule minimizes communication to the greatest extent feasible by forbidding ex parte substantive communication between a defense lawyer and a patient's treating physician.

Finally, the rule against substantive ex parte communication does not rest on the assumption that "physicians or lawyers will engage in professional misconduct . . .." Majority op. at 467. Instead, it recognizes that a patient's right to keep certain information confidential outweighs the potential that a communication between a defense attorney and a treating physician might, even unintentionally, result in a breach of confidential information. Similarly, this court's rule

prohibiting ex parte communications between a judge and a lawyer appearing before that judge is not premised on the assumption that judges and lawyers will engage in misconduct.[2] It merely recognizes that the right to a fair trial is important enough to guard against anything that could potentially undermine, or have the appearance of undermining, that right.

The plaintiffs urge the court to read *Klieger* as prohibiting all communications between a defense lawyer and a treating physician. The plaintiffs assert that even insubstantial communications pose the risk of disclosing confidential information. While I recognize this risk, I believe that a bright line "no-communications-about-anything-under-any-circumstances" rule would be overprotective of a plaintiff to the detriment of a defendant, who might be subject to sanctions for even minor, irrelevant infractions of the rule. Such inequities would be resolved by exceptions that chipped away at the rule until the rule eventually resembled the mandate that *Klieger* already represents.

Instead of following the majority's lead to overrule *Klieger*, I believe this court should strengthen the protection and balance that *Klieger* attempts to provide. One way is to explain more fully the legal basis and public policy implications of *Klieger*, as Justice Janine Geske's concurrence does. Other techniques might

---

[2] Supreme Court Rule 20:3.5(b) provides:

A lawyer shall not:

(b) communicate ex parte with [a judge, juror, prospective juror or other official] . . . except as permitted by law or for scheduling purposes if permitted by the court. If communication between a lawyer and judge has occurred in order to schedule a matter, the lawyer involved shall promptly notify the lawyer for the other party or the other party, if unrepresented, of such communication.

include a protective order or a restrictive authorization about ex parte communications issued by the circuit court; this court's requirement that a record be made of any ex parte communication;[3] this court's requirement that when an ex parte communication occurs between a defense lawyer and a plaintiff's treating physician, the lawyer should "promptly notify the lawyer for the other party or the other party, if unrepresented, of such communication . . .." SCR 20:3.5(b) (relating to ex parte communications with a judge). Still another technique is suggested by the majority opinion, namely that defense attorneys advise treating physicians about confidential communications before any discussion. Majority op. at 468. Plaintiffs, defendants and the public interest can be protected in various ways. I believe the court would be wise to explore them.

## II.

I next turn to apply the *Klieger* rule to the case at bar. In this case the circuit court determined that the three-way telephone conversation of Dr. Jensen, his lawyer and Dr. Hanna violated the *Klieger* rule because the conversation included a discussion of Dr. Hanna's treatment of Mrs. Steinberg. The circuit court also concluded that the meeting of Drs. Jensen, Beroukhim and Wong did not violate the *Klieger* rule because Dr. Jensen's lawyer did not participate in the conversation, the conversation was not of a substantive nature, and the doctors were entitled to see the medical records involved. The circuit court voiced perplexity about the appropriate sanctions for the *Klieger* rule

[3] *See* Jacqueline M. Asher, et al., *Ex Parte Interview with Plaintiff's Treating Physicians—The Offensive Use of the Physician-Patient Privilege,* 67 U. Det. L. Rev. 501 (1990).

violation, ultimately deciding that because the violation was not egregious, severe sanctions were not required.[4] Instead, the circuit court admonished Dr. Jensen's lawyer to adhere to *Klieger* in the future.

An appellate court reviews a circuit court's determination of a *Klieger* violation and the sanctions warranted under the erroneous exercise of discretion standard. The circuit court's determination will not be reversed on appeal if it has a reasonable basis and was made in accord with the facts of record and with accepted legal standards. *Wikrent v. Toys "R" Us, Inc.,* 179 Wis. 2d 297, 306, 507 N.W.2d 130, 133 (Ct. App. 1993).

Although the court of appeals referred to the erroneous exercise of discretion standard, I do not think the court of appeals applied that standard in this case. Rather, as I read its decision, the court of appeals reviewed the record *de novo,* concluding that both conversations violated the *Klieger* rule and that a new trial was the appropriate sanction against the defendant.

I conclude that the circuit court did not erroneously exercise its discretion. The circuit court examined the facts of the case and reasoned its way to a reasonable conclusion consistent with applicable law. Accordingly I believe that the court of appeals should have affirmed the circuit court's decision.

For the reasons set forth, I concur in the mandate.

JANINE P. GESKE, J. *(concurring).* Although I agree with the mandate of the court, I write separately to emphasize that *State ex rel. Klieger v. Alby,* 125 Wis.

---

[4] The sanction that should be imposed for a *Klieger* violation poses a very difficult question. A sanction should be fair to both parties and should be neither meaningless nor overly harsh.

2d 468, 373 N.W.2d 57 (Ct. App. 1985), erroneously concluded that the physician-patient privilege is not waived upon commencement of a lawsuit. The rule prohibiting *ex parte* communications between an attorney and an opposing party's physician regarding the medical information of the opposing party must be based upon public policy considerations and not upon the discovery rules under ch. 804, Stats., or the rules of evidence under ch. 905, Stats.

In *Klieger,* a medical malpractice case, the court of appeals stated that there is "no case law to support the notion that a statutory physician-patient privilege is waived on commencement of a lawsuit so as to allow informal conferences with treating physicians, unless the privilege is lost due to unrelated exceptions." *Klieger,* 125 Wis. 2d at 473. In reaching this conclusion, the court of appeals considered whether the circuit court erred when it refused to prohibit the attorneys for the defendant-physician and the hospital from informally consulting the plaintiff's treating doctor about the case. Specifically, the court of appeals analyzed whether the exception provided in § 905.04(4)(c), Stats., allowed such "informal discovery." *Id.* The court concluded that the statutory exception to the physician-patient privilege did not cover informal discussion, reasoning that the scope of the exception is limited to evidence which is uncovered only through statutorily permitted methods of discovery, such as oral or written depositions and interrogatories. In particular, the court of appeals relied upon the following language in § 905.04(4)(c): "There is no privilege . . . as to communications relevant to or within the scope of discovery . . .." In other words, a patient-litigant does not waive the physician-patient privilege with regard

to any evidence that is outside the scope of formal discovery.

I believe the court of appeals in *Klieger* misinterpreted § 905.04(4)(c). The statute does not create an exception to the privilege only within the scope of formal discovery. Clearly, once a patient-litigant puts his or her physical, mental, or emotional condition into issue in a lawsuit, any confidential physician-patient communications relating to that issue, including those relevant to discovery under ch. 804, Stats., are not privileged.

Despite the filing of a lawsuit, the patient-litigant, in fact, retains the right to expect that his or her treating physician will only release the information that is relevant to the issues in the litigation. The physician-patient relationship is premised upon confidentiality. The Hippocratic Oath, the American Medical Association's Principles of Medical Ethics, and the Current Opinions of the Judicial Council of the American Medical Association define the physician's ethical responsibilities regarding confidentiality. *See Petrillo v. Syntex Laboratories, Inc.,* 499 N.E.2d 952, 957 (Ill. App. Ct. 1986). These three ethical sources all highlight "the highly confidential nature of the physician-patient relationship . . .." *Id.* A doctor who discloses confidential patient information in the course of a conversation may be exposing himself or herself to liability for a common law tort for breach of that confidential relationship. Physicians, like attorneys, must adhere to their profession's ethical rules regarding the preservation of patient confidentiality.

When, as in *Klieger,* a defense attorney desires to talk informally to a treating doctor outside the presence of the patient-litigant, there is a substantial risk that the conversation will wander outside the medical

481

information "relevant to or within the scope of discovery examination of an issue of the physical, mental or emotional condition of a patient," § 905.04(4)(c), Stats., and into medical information that is still privileged under both § 904.04(2) and the general rules of physician-patient confidentiality. Since neither the patient-litigant nor his or her attorney is present, they are unable to protect against the disclosure of the confidential and privileged information. In filing a lawsuit, a patient-litigant waives the privilege and confidentiality only as to some information, but "does not automatically consent to the termination of the confidential relationship existing between [the patient] and . . . physician." *Petrillo,* 449 N.E.2d at 959.[1]

In order to protect the confidentiality of a patient-litigant, I believe that public policy requires a prohibition of *ex parte* communications between the opposing attorney and the patient-litigant's treating physician about confidential medical information. This prohibition, however, does not compel the conclusion that opposing counsel should be prohibited from all *ex parte* communications with the patient-litigant's treating physician. Not all *ex parte* communications imperil the sanctity of the confidential relationship. As the majority notes, opposing counsel should be able to communicate *ex parte* with a patient-litigant's treating physicians for the purpose of discussing scheduling or procedural matters or even to tell a physician that he or she may be joined as a party to the lawsuit. Majority op. at 469; *see, e.g., Haack v. Temple,* 150 Wis. 2d 709, 718, 442 N.W.2d 522 (Ct. App. 1989) (conversations which discuss the mechanics of a deposition are permissible). Attorneys who do choose to talk to a treating

---

[1] I note here that this court does not adopt the rule stated in *Petrillo.*

physician outside the presence of the patient-litigant must take great care not to allow the conversation to include confidential information.

The majority correctly holds that defense counsel may communicate *ex parte* with a patient-litigant's treating physician so long as the communication does not involve the disclosure or discussion of confidential information and so long as the physician is not represented by counsel. Majority op. at 469. This holding permits appropriate nonconfidential communications between defendant's attorney and plaintiff's treating physician. *Ex parte* communications which are prohibited by the rule because they undermine the sanctity of the physician-patient relationship must, therefore, be clearly distinguished from those which are permitted because they do not disclose confidential information.

I am authorized to state that Chief Justice NATHAN S. HEFFERNAN and Justice SHIRLEY S. ABRAHAMSON join this concurring opinion.